Filed 9/30/14  P. v. Kidd CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEANDRE LAMAR KIDD,<br><br>    Defendant and Appellant. | E058740<br><br>(Super.Ct.No. FSB1102510)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed with directions.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Deandre Lamar Kidd of first degree

1

murder (count 1; Pen. Code, § 187, subd. (a))[1] and deliberate and premeditated attempted murder (count 2; §§ 664/187, subd. (a)).  The jury additionally found true allegations attached to both counts that defendant personally used a firearm (§ 12022.53, subd. (b)); personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)); and committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).  The court sentenced defendant to an indeterminate term of incarceration of 75 years to life followed by an indeterminate life sentence with a minimum parole eligibility of 15 years.

On appeal, defendant contends the court erred in permitting the People to adduce evidence of criminal gang activity which occurred after the offenses for which defendant was tried and which did not involve defendant.  Defendant additionally maintains the court's imposition of a consecutive 25 year to life term on the true finding for personal and intentional use of a firearm in his commission of murder violates constitutional proscriptions against being twice placed in jeopardy.  The People contend the abstract of judgment must be corrected to reflect defendant's sentence on count 2 was imposed consecutively, rather than concurrently, to the sentence imposed on count 1.  We shall direct the superior court to correct the abstract of judgment.  In all other respects, the judgment is affirmed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL HISTORY

Glenn Harris testified that in April or May 2011, he was jumped by members of Fudge Town Mafia Crips (FTMC). Harris believed one of the members of the group who beat him was Brandon Barnes or "Sticky," as he knew him. In late May 2011, Kevion Barnes, Brandon's brother, and friend Felton Strong went to a donut shop together.[2] Defendant, defendant's brother Shaquaill Kidd, Harris and a few other individuals were there.

Harris approached Kevion and asked him if he was "Sticky Low" from FTMC. Kevion testified his brother was a member of FTMC with the moniker of "Sticky Low." Many people told Kevion that he and his brother looked alike, sometimes saying they looked like twins. Neither Kevion nor Strong were gang members.

Harris testified that if Kevion had turned out to be Brandon, Harris planned on challenging him to fight. Kevion told Harris he was not Brandon, defendant confirmed the fact, and Harris left.

Approximately a week later, on June 2, 2011, around 1:00 a.m., Kevion and Strong were walking near the intersection of Sierra and Baseline in the City of San Bernardino. Defendant rode past them twice on a mountain bike. Defendant rode by them again alongside Shaquaill on another bike. Defendant came within three feet of Strong and shot Strong.

---

[2] Since the Barnes and Kidd brothers share the same surnames, we shall refer to them by their first names for clarity and ease of reference. No disrespect is intended.

Kevion and Strong started running.  Strong yelled out that he had been hit, ran up to a white truck in the intersection, requested help, and collapsed.  Kevion continued running as defendant kept pursuing him.  Kevion tried to hop a fence, but defendant pulled him off, told him to stop running, and shot him.  Defendant fled on his bike.

Strong sustained a gunshot wound to the left side of his chest.  "[T]he bullet went through the left chest wall, it injured the left lung, the heart, the esophagus, and the right lung.  The bullet then penetrated into the muscle of the right back."  The medical examiner testified the cause of Strong's death was a gunshot wound to the chest; the manner of death was homicide.

Kevion was transported to the hospital.  Kevion sustained bullet wounds to his hand and arm for which he received seven stitches.  A bullet remains lodged in Kevion's arm.  Kevion also sustained a grazing bullet wound to his left leg.

Kevion informed officers at the hospital that defendant was responsible for the shooting and that he believed Shaquaill had also been present.  Kevion identified defendant from a photograph.  Kevion identified Shaquaill from a six-pack photographic lineup.  Officers arrested defendant around 3:00 p.m. that day at an apartment complex he frequented.

The People's expert gang witness testified defendant had previously admitted membership in 4 Tray Gangsta Crips (4TGC) in contacts with police on several prior occasions going back years.  4TGC is a Black street gang which congregates in the area of Baseline and Sierra in San Bernardino.  "Retaliation is very important in gang culture. . . . If a gang member is assaulted, shot, killed, it falls on the members of his gang to

4

retaliate and try and harm shoot, kill, one or two of the rival gang members that's killed that particular gang's homeboy." Sometimes gang members' families can be targeted for retaliation. Shaquaill is a member and Harris is an associate of the Inland Empire Projects Gang.

Forensic specialists collected gunshot residue from defendant, Kevion, and Strong. Four unique gunshot residue particles were found on defendant. Kevion had three unique gunshot particles on his person. Seven unique gunshot particles were found on Strong. "The conclusion from a positive result indicates that the individual has fired a firearm, has handled a firearm, was in close proximity, meaning outwards of zero to twelve feet from a discharging firearm, or contacted a surface containing gunshot residue."

The gang expert opined that defendant was an active member of 4TGC whose actions, in a hypothetical resembling the facts of the instant case, would burnish his own reputation and the reputation of his gang. He opined the incident at the donut shop a week before the murder was gang related.

Defendant's friend, Jason Mumford, testified defendant; defendant's girlfriend, Leslie Sowell; and Harris had spent the night at Mumford's apartment on June 2, 2011. Sowell similarly testified she and defendant spent the entire night in Mumford's apartment. After he was arrested, defendant told an officer he had spent the entire night at the apartment.

DISCUSSION

A. Evidence of Subsequent Gang Activity.

Defendant contends the court improperly allowed the People to introduce evidence of gang activity that occurred after the offenses charged in the instant case. We disagree.

During the testimony of the People's gang expert, the prosecution asked whether "after this incident where [defendant] was alleged to have shot and killed Felton Strong and shot Kevion Barnes, did you see an increase in violence among Fudge Town gang members in this area . . . ?" Defense counsel objected on the basis of relevance. The court sustained the objection. The People then asked, "After this incident occurred on June 2nd, was there an increase in violence with the Fudge Town Mafia Crip gang?" The expert responded, "Yes."

The prosecutor then asked if this escalation in violence was in the area of the apartment complex which defendant frequented and where he was arrested. The expert testified that the increase in gang activity was within a half mile to a mile radius of the apartment complex. The prosecutor asked what kind of gang activity occurred. The expert responded that one individual was involved in a stabbing and attempted murder. Defense counsel objected that there was no basis for the subject matter as it related to the instant case. The court overruled the objection.

The expert continued, "Brandon [] was involved in a – arrested for a murder a few blocks away from Baseline and Sierra Way. Jamel King [] was arrested for a robbery and then also a weapons' possession charge at the house down a few blocks south of there. [¶] And then there was a lot of activity with the gang hanging out at those two residences

6

that I mentioned.  We also investigated a shots-fired right in front of the Fudge Town house, which was south of Baseline and Sierra Way."  The expert testified there was further violence targeted at both gang members and "civilians."  Defense counsel objected again as to the "specificity as to the allegations in this case to this particular gang."  The court overruled the objection finding  it was "foundation to something."

The prosecutor asked what significance this uptick in gang activity by FTMC had in the area.  The expert responded, "The fact that Fudge Town was extremely active in our city, both at the time of this murder and also after it and that their jumping of Glenn Harris led to the retaliation shooting."

""Relevant evidence" means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' [Citation.]" (*People v. Brown* (2014) 59 Cal.4th 86, 103.)  "We review a trial court's relevance determination under the abuse of discretion standard.  [Citation.]" (*People v. Riccardi* (2012) 54 Cal.4th 758, 815.)  "'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.' [Citation.]" (*Brown,* at p. 101.)

Here, evidence that FTMC gang activity in the vicinity, including killings and attempted killings, occurred after the instant offenses was relevant to show the instant offenses were gang related because the subsequent offenses evidenced the requirement that a gang retaliate if any of its members or family members were attacked by another gang.  Here, in particular, this was especially relevant as Kevion's brother, Brandon, a

7

FTMC member, had been subsequently arrested for murder a few blocks away from the site of the instant incident. The court acted within its broad discretion in allowing testimony on the subsequent gang activity in the area.

Defendant contends the evidence should have been deemed inadmissible under Evidence Code section 1101, subdivision (b), because the acts did not involve defendant. Courts have found evidence of subsequent events admissible when they involved the defendant. (*People v. Balcolm* (1994) 7 Cal.4th 414, 425 ["The circumstance that the uncharged offense occurred *after* the charged offense does not lessen its relevance . . . ."; *People v. Taylor* (1986) 180 Cal.App.3d 622, 636 ["Nor is it necessary that an uncharged act be prior to the charged offense to be relevant."]; *People v. Griffin* (1967) 66 Cal.2d 459, 464-465 [Evidence of subsequent crime admissible as relevant to prove victim's injuries were not inflicted accidentally.]; *People v. Medina* (2003) 114 Cal.App.4th 897, 902-903 [Evidence of subsequent sexual offenses admissible relevant to the defendant's propensity to commit sex offenses]; *People v. Williams* (1970) 10 Cal.App.3d 638, 643 ["Evidence of a second crime need not be excluded merely because the second crime occurred after the crime charged."].)

Although all of these cases addressed offenses committed by the defendant and not another party, defendant cites no authority barring the type of evidence admitted here. Indeed, the issue, as identified by defendant's counsel below, was the relevance of the evidence, not its admissibility under Evidence Code section 1101, subdivision (b). Moreover, because the evidence did not involve defendant himself, it was less prejudicial to defendant than the evidence in the cases cited above which were admissible under

Evidence Code section 1101, subdivision (b), and actually involved actions by the defendant. Thus, the court acted within its discretion in admitting the evidence of subsequent gang activity in the area.

Finally, to the extent there could be deemed any error, under any standard the error was harmless. Kevion knew defendant because defendant had previously lived upstairs from his sister's apartment and defendant had visited Kevion's sister there. Kevion had previously seen defendant on numerous occasions. Kevion had been in the same room together with defendant seven to 10 times. Kevion identified defendant as the shooter shortly after arriving at the hospital. Kevion identified defendant as the shooter during trial. Kevion testified "I know it was him."

Kevion, Strong, and defendant all tested positive for gunshot residue contextually indicating they had been involved in a shooting. Defendant's alibi witnesses' stories conflicted with one another regarding what times they had each arrived at Mumford's apartment, what times they had left, what times they went to sleep, what times they woke, and whether they were even there. Harris testified he might have spent the night in an alley rather than Mumford's apartment. Harris had previously told an officer he spent the night on a couch behind an old tire store rather than at Mumford's apartment. Sowell did not come forward with her story until 19 months after the shooting despite having been present during the preliminary hearing more than a year earlier.

Defendant had admitted to membership in FTMC on numerous occasions over several years in contacts with police. Harris was a "very strong associate of the [Inland Empire Projects gang] and [a] very strong associate of gang members." Shaquaill,

9

defendant's brother, was a member of the Inland Empire Projects gang. Harris knew and hung out with both defendant and Shaquaill. Kevion placed Shaquaill at the shooting as well. Harris had been jumped by FTMC members, one of which he believed to be Kevion's brother. Harris wanted retaliation. "Retaliation is very important in gang culture." Retaliation may include targeting gang members' family members. The gang expert testified the shooting would burnish defendant's reputation in his gang and the reputation of the gang itself. Thus, overwhelming evidence supported the jury's verdict and findings that defendant killed Strong and shot Kevion for the benefit of, at the direction of, or in association with a criminal street gang.

B. Double Jeopardy.

Defendant contends the court's imposition of a consecutive 25-year-to-life term on the section 12022.53, subdivision (d), enhancement violates constitutional proscriptions against double jeopardy because it relied upon the same facts underlying his conviction and sentence for the murder in count 1. We disagree.

Enhancements do not constitute separate crimes or offenses; therefore, imposition of punishment on enhancement allegations does not implicate federal double jeopardy principles. (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130; *People Izaguirre* (2007) 42 Cal.4th 126, 134; *People v. Sloan* (2007) 42 Cal.4th 110, 121.) The decisions of the California Supreme Court are binding on and must be followed by appellate courts. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Defendant recognizes the aforementioned decisions preclude a holding by this court in his favor on this issue. However, defendant raises the issue to preserve it for

10

further review. We hold the trial court did not violate constitutional proscriptions against double jeopardy in imposing a consecutive 25-year-to-life term on the section 12022.53, subdivision (d), enhancement attached to count 1.

C. Abstract of Judgment.

The People contend the abstract of judgment must be corrected to reflect correctly the court's imposition of a consecutive, rather than a concurrent, term on the count 2 offense.

"It is well settled that '[a]n abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize. [Citation.]' [Citation.] When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, [appellate courts have] the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties. [Citation.]" (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

Here, the court imposed 25 years to life on count 1; a consecutive 25-year-to-life term on the section 12022.53, subdivision (d), enhancement attached to count 1; a consecutive, indeterminate life term with a minimum parole date of 15 years on the count 2 offense; and a consecutive 25-year-to-life term on the section 12022.53, subdivision (d), enhancement attached to count 2. The abstract of judgment incorrectly reflects the court imposed a concurrent term on the count 2 offense. Thus, the abstract of judgment must be corrected to reflect accurately the court's pronouncement of judgment.

11

DISPOSITION

The superior court is directed to correct the abstract of judgment to reflect accurately the court's pronouncement of judgment that the sentence on count 2 was consecutive, rather than concurrent, to the sentence on count 1.  The corrected abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

RAMIREZ

P. J.

KING

J.

12